Karl L. ANDERSON, Respondent,

v.

FRONTIER COMMUNICATIONS and
CNA/American Casualty Company
of Reading, PA, Relators,

and

Twin Cities Spine Center, Intervenor.

No. A11–0834.

Supreme Court of Minnesota.

Aug. 10, 2012.

DeAnna M. McCashin, Schoep & McCashin, Chtd., Alexandria, MN, for respondent.

Kenneth D. Nelson, Law Offices of Jeffrey A. Magnus, Edina, MN, for relators.

OPINION

ANDERSON, G. BARRY, Justice.

The issue presented in this case is whether respondent Karl L. Anderson is barred from receiving workers' compensation benefits because he failed to give timely notice to his employer of a work-related injury. A compensation judge found that Anderson was barred from receiving workers' compensation benefits because his written notice of injury, given nearly 2 years after Anderson's last day of work, was not timely and Anderson's employer, Frontier Communications, did not have actual knowledge that Anderson's back problems were work-related. The Workers' Compensation Court of Appeals reversed, concluding that a reasonable person in Anderson's position would not have known that his injury was compensable until Anderson's doctors provided written reports to Anderson's attorney establishing a relationship between Anderson's back problems and his job duties. We reverse.

From 1987 to 2007 Anderson worked for Frontier Communications as a lineman. Anderson's job entailed installing cable, repairing and replacing cable boxes, and maintaining and stringing overhead cable—a very physical job that required Anderson to lift as much as 100 pounds at a time. According to Anderson, the most strenuous part of his job was bending over to mark underground cables with small flags to guard against accidental damage

to the cables from digging. Anderson testified that he went through 7,000 to 10,000 flags in a season.

Anderson had no back problems before joining Frontier in 1987. In 1996, Anderson asked his physician for a shot of Demerol, claiming his back hurt after a day of shoveling dirt at work. Anderson testified before the compensation judge that although he initially reported this to his physician as a work injury, he changed his mind after realizing that it would result in a workers' compensation claim. In 1998, Anderson hurt his low back getting out of his employer's truck, but again did not report this as a work injury.

Between 2004 and 2005, Anderson's back progressively worsened, with pain at the beltline and down his right leg. The pain was worse at the end of a work day and progressively worse during the work week. According to Anderson, nearly anything he did seemed to increase his back pain and he gave up playing sports. Anderson did not initially seek medical treatment, figuring he was just getting old. By March 2007 Anderson was icing his back nightly. Anderson saw his physician for the problem; x-rays showed degenerative changes in Anderson's low back and wrist. He was referred for cortisone shots, which provided no relief; Anderson was then referred to a spinal surgeon. Anderson agreed that by April 2007 he knew that the work activities that he was doing at Frontier Communications were aggravating his low back.

In May 2007 the surgeon diagnosed Anderson with spondylolisthesis, spinal stenosis, and degenerative disc disease. Anderson's medical records reflect that Anderson's job was discussed at the initial consultation. In testimony before the compensation judge, Anderson further agreed that after talking with the surgeon in May 2007, he knew that the work activities were a cause of his low back problems or were aggravating his low back problems. Indeed, Anderson testified:

> [A]fter I saw the first x-rays and the MRI's and the results and how much damage was done to my back, and they explained that everytime I bent over that there was two and a half centimeters of travel in my spinal cord, I mean in my back, and that it was pinching my spinal cord, that's when I realized from all the stooping and bending that I'd been doing all these years that my discs were wore out and they had to be replaced.

But Anderson's surgeon did not place any restrictions on Anderson's work during the time period between the surgical consultation and the surgery itself.

Anderson told his supervisor at Frontier Communications in June 2007 that he needed to take time off for low-back surgery, but did not tell anyone at Frontier that his back condition related to his work. Anderson's last day of work was July 4, 2007. In testimony before the compensation judge, Anderson agreed that he knew by July 4th of 2007 that his low back was aggravated by his work activities at Frontier Communications. On July 6, 2007, the surgeon performed an anterior discectomy and fusion. Anderson had additional surgery a week later for compression of the nerve root and again in February 2008 to redo part of the spinal fusion. Despite the surgeries, Anderson continues to have pain in his left leg and hip. He has trouble standing, sitting, and walking for more than a few minutes, and has not worked since July 4, 2007.

Anderson received short-term disability benefits for 90 days through his union and long-term disability benefits after 90 days. The long-term disability policy required Anderson to apply for social security disability insurance (SSDI) benefits, which

were initially denied. In March 2009 the Social Security Administration found Anderson disabled as of July 4, 2007, his last day of work, and awarded Anderson benefits retroactive to January 2008. Anderson received a lump-sum SSDI payment, from which the long-term disability insurer demanded reimbursement for benefits paid under the long-term disability policy. Anderson consulted an attorney for help with the insurer's demand and eventually repaid the long-term disability insurer.

In April 2009 Anderson's attorney wrote to his physicians, asking whether the long-term physical demands of Anderson's job were a contributing factor to Anderson's need for surgery and medical treatment. Anderson's family doctor and his surgeon each responded that the physical demands of Anderson's job had significantly aggravated Anderson's pre-existing back condition. In May 2009, nearly two years after Anderson's last day of work, Anderson's attorney gave Frontier written notice that Anderson was claiming his back injury was work-related.

For an employee to receive workers' compensation benefits, and subject to several exceptions not applicable here, Minn. Stat. § 176.141 (2010) requires either that the employee give written notice of injury to the employer, or that the employer have actual knowledge of the injury, within 180 days of the occurrence of the injury. Nevertheless, we have held that the notice period under section 176.141 may be tolled until "it becomes reasonably apparent to the employee that the injury has resulted in, or is likely to cause, a compensable disability." *Issacson v. Minnetonka, Inc.,* 411 N.W.2d 865, 867 (Minn.1987). Put another way, "[t]he time period for notice

or claim does not begin to run until the claimant, as a reasonable person, should recognize the nature, seriousness and probable compensable character of his injury or disease." *Id.* (quoting 3 A. Larson, *The Law of Workmen's Compensation* § 78.41(a) (1983)); [1] *cf. Jones v. Thermo King,* 461 N.W.2d 915, 917 (Minn.1990) (observing "that for both personal injury and occupational disease, the statute of limitations begins to run when the employee has sufficient information of the nature of the injury or disease, its seriousness, and probable compensability").

■ A compensation judge found that Anderson had sustained a *Gillette*-type injury arising out of and in the course of his employment, culminating on Anderson's last day of work. *See Gillette v. Harold, Inc.,* 257 Minn. 313, 320–22, 101 N.W.2d 200, 205–06 (1960) (holding that when a preexisting infirmity is aggravated by repetitive minute trauma as a result of the ordinary and necessary duties of employment, the disability resulting from such aggravation is compensable as a personal injury under the workers' compensation statute). The compensation judge found, as Anderson had testified, that Anderson knew in April 2007 "that his work aggravated his low back." The compensation judge further found that Anderson, after talking to the surgeon, "knew the work aggravated or caused the low back problem." Although Anderson did not recall talking to either of his doctors "about work causing or aggravating his problem," the compensation judge found that Anderson "assumed that it did" and that from April 2007 on, Anderson "assumed ... that the work caused or aggravated his problem." Based on a preponderance of the evidence, the compensation judge found that

---

1. This section is currently located in 7 Arthur Larson & Lex K. Larson, *Larson's Workers'* · *Compensation Law* § 126.05[1] (2011).

Anderson had not given his employer timely notice of his claimed work injury. The compensation judge further found that Anderson had not established that his employer had "inquiry notice" of Anderson's injury as of July 4, 2007, Anderson's last day of work.[2] The compensation judge therefore denied Anderson's claim for workers' compensation benefits.

The Workers' Compensation Court of Appeals (WCCA) reversed the denial of benefits. *Anderson v. Frontier Commc'ns,* 2011 WL 1739771 (Minn. WCCA Apr. 11, 2011). The WCCA noted that the medical records of Anderson's initial visit to his family physician in March 2007 made no mention of Anderson's work. *Id.* at *2. The WCCA further noted that Anderson's surgeon placed no restrictions on Anderson, and Anderson continued to work until just a couple of days before his back surgery. *Id.* The WCCA points out that when Anderson returned to his surgeon in January 2008 complaining of continuing low-back problems, he also reported numbness in his left hand, and a cervical MRI performed in February 2008 showed mild canal stenosis. *Id.* According to the WCCA, Anderson's family doctor attributed Anderson's back and wrist problems in March 2007 to "degenerative changes." *Id.* at *4. The WCCA reasoned that Anderson should not have been required to give notice to his employer that his back problems were work-related "when there was no medical evidence making that connection and where the existing medical evidence provided a different reason for his problems." *Id.* at *5. According to the WCCA, "substantial evidence does not support a conclusion that a 'reasonable'

person [in Anderson's position] would have known he had a compensable injury which needed to be reported to his employer until [Anderson's doctors] provided reports establishing a work relationship to Mr. Anderson's attorney." *Id.* The employer and its insurer petitioned for review by certiorari.

## I.

▉ Under Minn.Stat. § 176.141 and our case law, an employee must give notice of injury no more than 180 days after "it becomes reasonably apparent to the employee that the injury has resulted in, or is likely to cause, a compensable disability." *See Issacson v. Minnetonka, Inc.,* 411 N.W.2d 865, 867 (Minn.1987). We first consider whether the WCCA erred in overturning the compensation judge's finding that Anderson failed to give timely notice to Frontier of his work-related injury.

▉ The date on which an employee has sufficient knowledge to trigger the duty to give notice of injury is a question of fact. *Barcel v. Barrel Finish,* 304 Minn. 536, 538, 232 N.W.2d 13, 15 (1975) (citing *Balow v. Kellogg Coop. Creamery Ass'n,* 248 Minn. 20, 78 N.W.2d 430 (1956)). The WCCA must affirm the compensation judge's findings of fact unless they are "clearly erroneous and unsupported by substantial evidence in view of the entire record as submitted." Minn.Stat. § 176.421, subd. 1(3) (2010). Moreover, when the evidence conflicts or when more than one inference may reasonably be drawn from the evidence, the compensation judge's findings are to be affirmed.

2. "Actual knowledge" is knowledge of such information as would put a reasonable man on inquiry. Mere knowledge of disability following a traumatic injury is not sufficient, for the facts and circumstances of either the disability or the injury must be such as would put a reasonable man on inquiry that the disability is work-related.
*Pojanowski v. Hart,* 288 Minn. 77, 81, 178 N.W.2d 913, 916 (1970) (citations omitted).

*Hengemuhle v. Long Prairie Jaycees*, 358 N.W.2d 54, 60 (Minn.1984). "When a workers' compensation matter comes to this court on certiorari, if the compensation judge's findings have been reversed, we look at the record to see if the compensation judge's findings had substantial evidentiary support." *Freyholtz v. Blackduck Sch. Dist. No. 32*, 613 N.W.2d 757, 758 (Minn.2000). We review questions of law de novo. *Roemhildt v. Gresser Cos.*, 729 N.W.2d 289, 292 (Minn.2007).

We conclude that there was substantial evidentiary support for the compensation judge's finding that Anderson knew no later than July 2007 that he had a compensable work-related injury. Anderson testified that his doctors explained to him before the surgery that every time he bent over to mark an underground line—which Anderson testified he did 7,000 to 10,000 times a year—his vertebrae pinched his spinal cord, eventually wearing out the discs in his back. According to Anderson,

> [A]fter I saw the first x-rays and the MRI's and the results and how much damage was done to my back, and they explained that everytime I bent over that there was two and a half centimeters of travel in my spinal cord, I mean in my back, and that it was pinching my spinal cord, that's when I realized from all the stooping and bending that I'd been doing all these years that my discs were wore out and they had to be replaced.

The WCCA agreed with the employer that "a medical report establishing a *Gillette* injury is not required before notice must be given." *Anderson v. Frontier Commc'ns*, 2011 WL 1739771, at *4 (Minn. WCCA Apr. 11, 2011). Rather, the WCCA concluded, "[t]he question here is whether Mr. Anderson's actions were reasonable given the information available to him." *Id.* Nevertheless, the WCCA reversed the compensation judge on the ground that Anderson "should not have been required to give notice to his employer that his problems were the result of his work history when there was no medical evidence making that connection and where the existing medical evidence provided a different reason for his problems." *Id.* at *5.

In concluding that there was "no medical evidence" connecting Anderson's back problems to his work, the WCCA and the dissent appear to rely on the absence of any specific conclusion to that effect in Anderson's written medical records. But Anderson's medical records reflect that the nature of Anderson's job was discussed at the initial surgical consultation:

> The patient works for a telecommunications company and does a lot of physical labor including working up and down the telephone poles installing equipment. He sometimes lifts 50–60 pounds of weight. He is presently still working full time.

And Anderson himself testified that before the surgery his doctors "explained that everytime [he] bent over that there was two and a half centimeters of travel in . . . [his] back, and that it was pinching [his] spinal cord." Anderson further testified that seeing the x-rays and MRI's before the surgery, he "realized from all the stooping and bending that [he'd] been doing all these years that [his] discs were wore out and they had to be replaced." Under our standard from *Issacson*, "the information available to" Anderson—whether or not documented in Anderson's medical records—was that the wear and tear on his discs was the result of his work activities.

The dissent dismisses Anderson's testimony because it was in response to "questions posed to Anderson . . . phrased by Anderson's employer using a disjunctive clause"—that is, whether Anderson's work

for Frontier Communications was "causing" or "aggravating" Anderson's back problems. According to the dissent, "the fact that [Anderson] acknowledged that work may have aggravated his back pain does not mean that he also acknowledged that work caused his back injury." But Anderson's injuries were compensable, whether caused in the first instance by his work or whether his work merely aggravated a preexisting condition. *See Gillette v. Harold Inc.*, 257 Minn. 313, 317, 101 N.W.2d 200, 204 (1960) (recognizing "that a preexisting disease or infirmity of the employee does not disqualify a claim arising out of employment if the employment aggravated, accelerated, or combined with the disease or infirmity to produce disability for which compensation is sought").

The WCCA further concluded that the compensation judge's finding should be reversed because "the existing medical evidence provided a different reason for [Anderson's] problems." *Anderson*, 2011 WL 1739771, at *5. That "different reason," in the WCCA's view, appears to be "degenerative changes." *See id.* at *4 ("Dr. Gallagher attributed the hand problems and the low back problem to degenerative changes."). The WCCA analogized Anderson's case to *Beckmann v. Quebecor Printing, Inc.*, 1997 WL 347877 (Minn. WCCA June 9, 1997). *Anderson*, 2011 WL 1739771, at *4. *Beckmann* is distinguishable on its facts. In *Beckmann*, the employee's medical records initially attributed his hip pain to a prostate problem—a condition inherently inconsistent with a work-related injury; even after a total hip replacement, Beckmann's doctor denied that his condition was due to his employment. 1997 WL 347877, at *4. In other words, in *Beckmann* there was a specific, competing, non-work-related explanation for the employee's injuries. In this case, a diagnosis of "degenerative changes" is not inherently inconsistent with a work-related injury,

given the nature of Anderson's job duties and the length of time those duties were performed.

When the evidence conflicts or when more than one inference may reasonably be drawn from the evidence, the compensation judge's findings are to be affirmed. *Hengemuhle*, 358 N.W.2d at 60. Because there was substantial evidence, in the form of Anderson's own testimony, to support the compensation judge's finding that Anderson should have realized the seriousness of his condition and that the work he did caused or aggravated his back problems, we reverse the WCCA and affirm the compensation judge's finding that Anderson's notice of injury in May 2009 was not timely.

## II.

■ Under Minn.Stat. § 176.141, Anderson may still recover workers' compensation benefits, despite his failure to give timely notice of his injury, if his employer had actual knowledge of his injury. The compensation judge found that Anderson had not established that Frontier had notice of his injury as of his last day of work. Because of its disposition of the case, the WCCA did not reach the question of Frontier Communication's knowledge. Although we could remand the matter to the WCCA for its consideration, neither Anderson or Frontier disputed the compensation judge's factual findings with respect to the employer's knowledge. Rather, Anderson argued to the WCCA that the compensation judge erred, as a matter of law, in concluding that Frontier did not have timely inquiry notice of Anderson's injury. In the interest of judicial economy, we will address the issue.

■ We have defined "actual knowledge" in workers' compensation cases as follows:

"Actual knowledge" is knowledge of such information as would put a reasonable man on inquiry. Mere knowledge of disability following a traumatic injury is not sufficient, for the facts and circumstances of either the disability or the injury must be such as would put a reasonable man on inquiry that the disability is work-related.

*Pojanowski v. Hart,* 288 Minn. 77, 81, 178 N.W.2d 913, 916 (1970) (citations omitted). As we observed in *Issacson,* "[i]t is simply not enough that the employer is aware that an employee has shoulder pain." *Issacson v. Minnetonka, Inc.,* 411 N.W.2d 865, 867 (Minn.1987). Rather, to constitute actual knowledge, "an employer must have some information connecting work activity with an injury." *Id.*

▮ The compensation judge found that Anderson did not tell anyone at work that his back condition related to the demands of his job. Anderson does not dispute this finding. Rather, Anderson argued to the WCCA that because Frontier knew the demands of Anderson's job, Frontier had sufficient information in May 2007, when Anderson told his supervisor that he needed to take time off for back surgery, to inquire whether Anderson's job was a substantial contributing factor in Anderson's injury. But an employer cannot be deemed to have actual knowledge of an injury before the injury occurs. *Dickson v. Minn. Vikings Football Club,* 2008 WL 4790296, at *10 (Minn. WCCA Sept. 9, 2008). In this case, the compensation judge found that Anderson's injury culminated on July 4, 2007, his last day of work, a finding that neither Anderson nor Frontier have challenged on appeal. We conclude that the record is sufficient to support the compensation judge's findings relating to the employee's knowledge.

Because we affirm the compensation judge's findings that Anderson did not timely provide notice to his employer that he sustained a work-related injury and the employer did not have actual knowledge of such an injury, we reverse the WCCA and affirm the compensation judge's denial of benefits.

Reversed.

ANDERSON, PAUL H., Justice (dissenting).

I respectfully dissent. I would affirm the decision of the Workers' Compensation Court of Appeals (WCCA) and hold that Karl L. Anderson is entitled to seek workers' compensation benefits for his work-related *Gillette*-type injury.[1]

My dissent is in two parts. First, I join the concise and to the point dissent of Justice Meyer. Affirming the WCCA's decision should not require our court to say much more than what Justice Meyer has written. In fact, it requires even less. We should be summarily affirming the WCCA without even having to write an opinion. It is this circumstance that leads to the second part of my dissent and why I choose to write at some length in a case that I conclude should be resolved with a summary affirmance of the WCCA. The worker in this case, Karl L. Anderson, and other workers across our state deserve an explanation as to why I believe the majority has reached the wrong result.

This is a fact-specific case in which the result turns on the answer to a basic question—When did or when should Karl L. Anderson have known that his lower-back

---

1. *Gillette v. Harold, Inc.,* 257 Minn. 313, 320–22, 101 N.W.2d 200, 205–06 (1960) (holding that when a preexisting infirmity is aggravated by repetitive minute trauma as a result of the ordinary and necessary duties of employment, the disability resulting from such aggravation is compensable as a personal injury under the workers' compensation statute).

problem was "work related"? The majority concludes that there is substantial evidence to support the compensation judge's conclusion that Anderson not only should have realized that his work activities for his employer, Frontier Communications, caused his back injuries, but also Anderson should have come to this realization on his own accord much earlier than he did. Our workers' compensation law requires us to judge Anderson in light of the type of person he is and prohibits us from redefining Anderson to fit the mold of some "hypothetical reasonable person." *See* 7 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 126.05[4] (2011) (hereinafter "Larson & Larson"). In other words, we must take Anderson as we find him. When analyzing this case under what I believe to be the proper analytical approach it is not difficult to understand why Anderson behaved as he did—I do not find him to be an unreasonable person.

It should be beyond dispute that Anderson took a stoic attitude toward his injury and the resulting pain. He treated his pain with a certain indifference. Moreover, his actions are devoid of any attitude of entitlement to recompense just because continuing to work aggravated his back pain. When viewing Anderson's response to his injury, the adjective "long-suffering" comes to mind. It appears as though he was "[p]atiently enduring [the] wrongs or difficulties" he was experiencing in life. *The American Heritage Dictionary of the English Language* p. 1034 (5th ed.2011) (defining the term "long-suffering"). Anderson's attitude resulted in his failure, his unwillingness, or possibly his inability to legally connect the cause of his injury to his work at Frontier. Thus, it was not until April or May 2009, when Anderson's attorney and his physicians told him about the connection between work and his back pain, that the legal connection became ful-

ly evident to him. Based on my review of the facts and analysis under our workers' compensation law, I conclude that the timing of Anderson's realization that his injury was work related—April or May 2009— is reasonable and that his May 13, 2009 notice to Frontier was timely.

Anderson started working for Frontier in 1987 after working for 2 years for its predecessor. His job duties involved installing telephone cable and repairing telephones. In 1992 he transferred to Frontier's office in Wheaton, Minnesota. The Wheaton office, which is located in rural southwestern Minnesota, was a two-person operation with one person doing "inside" work and the other, Anderson, doing the "outside" work.

Frontier's official job description details the physical requirements of Anderson's job at the Wheaton office. Anderson was required to stand, climb, bend, stoop, sit, lift up to 70 pounds, work outside in extreme conditions, and, on a regular basis, walk on uneven terrain for extended periods of time. Additionally, Anderson testified that his duties also included digging out and replacing damaged cable boxes and repairing and replacing cable. Working with the cable often meant pulling cable weighing up to 150 pounds off a wheel. Additionally, Anderson stated that one of the most physical aspects of his job was bending over to place flags to mark cable locations at construction sites. During an annual construction season, Anderson would place between 7,000 and 10,000 flags.

Anderson had no physical problems or work restrictions when he began working for Frontier in 1987. He had no back problems until July 1996 when he first noticed some low-back pain after shoveling dirt all day. This 1996 event was the first time Anderson had any sign that some-

thing was going on with his back. After experiencing this back pain, he saw a physician who prescribed some pain medication. After receiving this medication, Anderson returned to work.

The record appears to indicate that in 1996 Anderson may have told his physician that his back pain was work related. But he subsequently rejected this idea when he realized he may have to make a claim for workers' compensation benefits. Rather, he ultimately attributed the injury to his own physical condition. When responding to a question about whether the 1996 injury was caused by his work at Frontier, he said, "[N]o, no, no, I'm back to work, I just got out of the truck wrong."

The record is unclear as to why Anderson responded as he did. But it provides some clues indicating that when Anderson gave his response he may have been concerned about being able to continue working because he needed the money a regular paycheck provided. In any case, Anderson did not seek any further medical assistance for his low-back pain until 1998 and then again in 2007. I believe that the ambiguous nature of Anderson's response and the lengthy time gap of almost 9 years between when he sought medical treatment in 1998 and again in 2007 render fruitless any speculation by our court as to why Anderson acted as he did in 1996.

Between 1998 and early 2007 Anderson noticed that his low-back pain was getting progressively worse, but he sought no further medical treatment until March 2007. The record reflects that during this 9-year time period no medical professional told Anderson that his low-back problem was work related. It also appears that during this time period Anderson took a stoic attitude toward his pain. The reason he gave for not reporting it as a work injury

was, "[b]ecause [he] had to get up the next morning and go to work." Then in 2004 and 2005 when his back problems worsened, Anderson said, "I just figured I was getting old." He stated that by March 2007 he finally "had enough of back pain," so he sought medical treatment and was examined by his family physician, Dr. Stanley Gallagher. At that time Anderson also had pain in his hand and wrist.

During the March 2007 visit with Dr. Gallagher there was no discussion that Anderson's work activity at Frontier was the cause of his pain. In May 2007 Anderson began treatment with a surgeon, Dr. Manuel Pinto. Dr. Pinto's assessment of Anderson's condition was a degenerative disc disease. Again, there was no discussion by Dr. Pinto about Anderson's work activity playing a role in this condition. Neither Dr. Gallagher nor Dr. Pinto placed any work restrictions on Anderson and he continued to perform his regular job duties at Frontier until early July 2007 when he had back surgery.

Six months after this surgery Anderson discussed with Dr. Pinto the numbness he was experiencing in his left hand. An MRI was performed and the test results suggested that degenerative changes in Anderson's cervical spine were causing the numbness. Again, Anderson's physical problems were not specifically linked to his work at Frontier.

Postsurgery, Anderson continued to have pain. He had trouble standing, sitting, and walking for more than a few minutes. Because of his continuing problems, Anderson did not return to work after his surgery. Approximately 1 year after his surgery Anderson was still unable to return to work. At this point Anderson sought and obtained social security disability benefits.[2] He sought these benefits

2. A worker may qualify for social security disability benefits without regard to whether

between July 2008 and March 31, 2009, when they were ultimately awarded.

As part of the Social Security benefit process, Anderson retained the assistance of an attorney. The attorney contacted both Dr. Gallagher and Dr. Pinto in April 2009. At that time, Dr. Gallagher indicated that Anderson's work at Frontier was most likely a substantial contributing factor to Anderson's condition. This communication is an important benchmark because the record shows that at no time before April 2009 did either Dr. Gallagher or Dr. Pinto inform Anderson that his work activity was a significant factor in his low-back pain or other medical problems. Upon receiving information that Anderson's injury may be work related, his attorney promptly notified Frontier in writing on May 13, 2009, that Anderson's injury may be work related.

Employees, like Anderson, are entitled to workers' compensation benefits for gradual injuries that are caused by long-term aggravation of a preexisting condition. For gradual injuries, the compensation claim is for the disability resulting from such aggravation. *Gillette*, 257 Minn. at 317, 101 N.W.2d at 204. We have said, "It is well recognized that a preexisting disease or infirmity of the employee does not disqualify a claim arising out of employment if the employment aggravated, accelerated, or combined with the disease or infirmity to produce disability for which compensation is sought." *Id.* at 317, 101 N.W.2d at 204. In *Gillette* we went on to say:

> It is well established by the authorities that when the inevitable effects of an underlying condition are hastened by an injury that is sudden and violent or the result of unusual strain or exertion, the

injury and its disabling consequences are compensable. It should further be conceded, however, that injuries may arise out of and in the course of the employment which do not occur suddenly or violently. In the course of one's ordinary duties injuries may occur daily which cause minimal damage, the cumulative effect of which in the course of time may be as injurious as a single traumatic occurrence which is completely disabling. We have been presented with no good reason why compensation should be paid in one instance and not in the other.

*Id.* at 321, 101 N.W.2d at 206. We have come to call the type of injury described in our *Gillette* opinion as a *Gillette*-type injury.

To be eligible for workers' compensation benefits for a work-related injury, including a *Gillette*-type injury, an employee is required to give timely notice to his employer of the work-related injury unless the employer has actual knowledge of the injury. Failure to provide timely notice may preclude an award of benefits. Minn. Stat. § 176.141 (2010). Timely notice is important because such notice allows an employer to not only deal with its employee's injury but also to protect its own interests. *See Rinne v. W.C. Griffis Co.*, 234 Minn. 146, 150, 156, 47 N.W.2d 872, 875, 878 (1951) (stating that notice provision is for the benefit of the employer to obtain knowledge of the injury, while waiting period is to prevent malingering by an employee). We have also said that "[t]he workers' compensation notice requirement is aimed at enabling the employer to furnish immediate medical attention in the hope of minimizing the seriousness of the injury and protecting the employer by per-

the disability is work related. *See Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir.2010) (listing the factors that an administrative law judge must consider when determining whether a worker qualifies for disability benefits under the Social Security Act).

mitting an investigation of the claim soon after the injury." *Schmidgall v. FilmTec Corp.*, 644 N.W.2d 801, 805 (Minn.2002). In the case of a *Gillette*-type injury, notice must be given within 180 days of when the injury occurred. Minn.Stat. § 176.141.

Here, the compensation judge and the majority conclude that when Anderson had back surgery in early July 2007 it should have been reasonably apparent to him that his injury was work related and that this was when the time clock began to run on the time period for him to give notice to Frontier that he had a potential *Gillette*-type injury. But we have said that the notice period for a *Gillette*-type injury only begins to run "from the time it becomes *reasonably apparent* to the employee that the injury has resulted in, or is likely to cause, a compensable disability." *Issacson v. Minnetonka, Inc.*, 411 N.W.2d 865, 867 (Minn.1987) (emphasis added); *see Swenson v. Cal–Mech*, 50 Minn. Workers' Comp. Dec. 1, 11 (WCCA 1993). Professor Arthur Larson indicates that "[t]he time period for notice or claim does not begin to run until the claimant, as a *reasonable person*, should recognize the nature, seriousness, and probable compensable character of his or her injury or

disease." 7 Larson & Larson, *supra*, § 126.05[1] (emphasis added); *see also Issacson*, 411 N.W.2d at 867.

Other commentators on workers' compensation law have noted that "[d]etermining the date upon which an employee has sustained an injury as a result of minute repetitive trauma is more an art than a science. Throughout the years, courts have struggled with when such trauma constitutes a compensable injury." *The Minnesota Workers' Compensation Deskbook* ch. 1 § 1.1, at 1–5 (Jay T. Hartman & Thomas D. Mottaz, eds.) (4th ed.2007). Professor Larson notes that the "practical problem" of fixing the date of a gradual injury "has generally been handled by saying simply that the date of [injury] is the date on which [the] disability manifests itself." 3 Larson & Larson, *supra*, § 50.05.[3]

The most significant factor in determining when the notice period begins to run is the employee's knowledge of a compensable injury. The record reflects that even though Anderson suspected that his work activity bothered his low back, he also believed that all activity bothered his back. *Cf.* 7 Larson & Larson, *supra*, § 126.05[6]

---

**3.** In many cases, the date of injury will be deemed to be the date on which the employee is first prevented from working. For certain purposes, however, "the date of [injury] may be identified with the onset of pain occasioning medical attention, although the effect of the pain may have been merely to cause difficulty in working and not complete inability to work." 3 Larson & Larson, *supra*, § 50.05. In Minnesota, the problems involved in ascertaining the date of injury for *Gillette*-type injuries have arisen in the context of commencing the notice and claim period, *Barcel v. Barrel Finish*, 304 Minn. 536, 537, 232 N.W.2d 13, 15 (1975); establishing compensability, *Schnurrer v. Hoerner–Waldorf*, 345 N.W.2d 230, 233 (Minn.1984); and attributing liability between successive employers or insurers, *Carlson v. Flour City Brush Co.*, 305 N.W.2d 347, 350 (Minn.1981). In *Carlson*,

this court stated that "the only rule capable of practical application is that injuries resulting from repeated trauma or aggravations of a pre-existing condition result in a compensable personal injury when their cumulative effect is sufficiently serious to disable the employee from further work." 305 N.W.2d at 350. But this line of reasoning does not automatically mean that an employee sustains a *Gillette*-type injury on the last day he worked. A determination of when a *Gillette*-type injury occurs is based upon all of the evidence and may relate to an earlier period of employment. *See Schnurrer*, 345 N.W.2d at 233. But here, the compensation judge determined the date of injury to be July 4, 2007, the last day on which the employee worked before surgery, and the date-of-injury is not in dispute.

(noting that even if a "claimant knows he or she is suffering from some affliction, this knowledge is not enough to start the statute if its compensable character is not known to [the] claimant"). When asked if there were things that made his back worse, Anderson said, "Just about everything I did made my back worse." When asked what he meant by "everything" he responded, "Well, I was a pretty physical guy. I mean I like sports and, you know, I like to fish, and I like to golf, and one by one those things just kind of fell by the wayside." He added that his back "hurt all the time." Anderson acknowledged that by July 2007 he knew that work, *like "everything" else*, aggravated his back. (Emphasis added.) He also stated that at the time he made these statements he was operating under the belief that the pain was due to advancing age and degenerative arthritis.

Unquestionably, Anderson's physicians identified his low-back symptoms as being due to a degenerative process. The physicians also attributed the symptoms in his hand and arm to degenerative changes. But even if a worker has been told by a treating physician that he or she has a specific ailment, "if [the ailment's] causal relation to the employment has not been explained, the [worker's] delay in [notice] may be excused." 7 Larson & Larson, *supra*, § 126.05[6]. Importantly, Anderson's physicians did not discuss with him the possibility that his back problems were work related. As previously noted, neither physician articulated this possibility until contacted by Anderson's attorney in the spring of 2009. The fact that Anderson's treating physicians only belatedly linked the injury to his work at Frontier may well be a major reason why Anderson only belatedly made the connection himself.

At this point, it is important to state that even though the proof of *Gillette*-type injuries primarily depends on medical evidence, I recognize there is no absolute requirement that a claimant have positive medical information linking an injury to his or her employment before the notice time clock can run. *See* 7 Larson & Larson, *supra*, § 126.05[6]. Rather, in this dissent I am simply reaffirming the need for our court to apply a balancing test that specifically includes the lack of medical evidence as an important, if not critical, factor to consider when determining whether notice of a *Gillette*-type injury is timely. Indeed, we have previously said, "the question of a *Gillette* injury primarily depends on medical evidence." *Steffen v. Target Stores*, 517 N.W.2d 579, 581 (Minn. 1994).

Given the foregoing fact scenario, I, unlike the majority, conclude that Anderson should not have been required to give notice to Frontier that his back problems were work related before he learned of that connection in April or May 2009. Before that time it would not have been "reasonable" for him to make this connection; rather, the existing medical information he received led him to believe there was a different cause of his problems—age and degenerative arthritis. The need to report to Frontier did not become evident to Anderson until Dr. Gallagher and Dr. Pinto provided information to his attorney suggesting a correlation between Anderson's work and his injury. Considering the evidence as a whole, I conclude that there is insufficient evidence to mandate a conclusion that a "reasonable" person with Anderson's background, intelligence, and education would have known he had a compensable injury before April or May 2009. Therefore, I would hold that the letter sent by Anderson's attorney to Frontier on May 13, 2009, constitutes

timely notice under the statute and case law.

My legal conclusion finds further support in certain recognized reasons that support a delayed notice and in the basic legal theory underlying workers' compensation law. Professor Larson cautions courts to remember "that the reasonableness of claimant's conduct should be judged in the light of the claimant's own education and intelligence, not in the light of the standard of some hypothetical reasonable person of the kind familiar to tort law." 7 Larson & Larson, *supra*, § 126.05[4]. Stated more simply, a reasonable failure or inability to understand the cause of the injury may justify a delayed notice. But Larson adds to these words of caution the additional reminder that "[o]n the other hand, it is not necessary for the claimant to know the exact diagnosis or medical name for the condition if he or she knows enough about its nature to realize that it is both serious and work-connected." *Id.; see also Rinne*, 234 Minn. at 146, 47 N.W.2d at 872. In *Rinne* we concluded that even though the employee did not know that the cause of his back pain was a ruptured or slipped disc, the accidental work injury was not so trivial or latent as to excuse late notice. *Rinne*, 234 Minn. at 155, 47 N.W.2d at 877. We noted that the facts showed that following the accident, the employee's back pain became severe and radiated down his leg, that it required medical attention, and that he was away from work for 4 days. *Id.*

Professor Larson notes that in addition to an employee's failure to recognize the nature of his condition, a failure to recognize the seriousness of a condition is a second reason that may justify a delay in giving timely notice. Larson states that the "claimant must have had reason to be aware of the seriousness of the trouble. This feature is a salutary requirement, since any other rule would force employees to rush in with claims for every minor ache, pain, or symptom." 7 Larson & Larson, *supra*, § 126.05[5] *see also Rebiski v. Pioneer Tel. Co.*, 262 N.W.2d 424, 426 (Minn.1978) (noting evidence supported finding that employee reasonably believed that fall from telephone pole would not result in disability); *Barcel v. Barrel Finish*, 304 Minn. 536, 537–38, 232 N.W.2d 13, 15 (1975) (holding that where symptoms of numbness in employee's right hand and forearm were at first intermittent and did not interfere with his work, the trivial injury rule applied to toll the statutory period for notice of injury to employer).

The third reason cited by Professor Larson for tolling the time to give timely notice is a failure to recognize the probable compensable character of the injury. He explains that "the claim period does not run until the claimant has reason to understand not only the nature and gravity of the injury but also its relation to employment." 7 Larson & Larson, *supra*, § 126.05[6]. Even if a "claimant knows he or she is suffering from some affliction, this knowledge is not enough to start the statute if its compensable character is not known to claimant." *Id.*

An example of this type of scenario occurred in *Williams v. Dobberstein*, 182 Neb. 862, 157 N.W.2d 776 (1968), a case cited by Larson. In *Dobberstein* the claimant sustained a back injury in a work-related accident in September 1965 but did not file a claim for benefits until December 1, 1966—a date that was well outside of Nebraska's 1–year limitation period for filing claims. *Id.* at 777–78. Larson said:

[A]nd although he continued to suffer pain, he remained at work until December 11, 1965. At that time he consulted a doctor, and after several periods of examination and treatment he was found, in November of 1966, to have a

protruding disc. The claim for benefits was filed on December 1, 1966. The lower court denied benefits, on the ground that claimant failed to file his claim within the one-year limitation period, which was held to begin to run on the day of injury, since it was not latent and progressive, and since he knew of the injury on the date of the accident. The appellate court reversed, holding that it was not necessary that the employee be completely unaware of his injury in order to toll the running of the claim period, but that the limitation period runs from the time that it is reasonably apparent that a compensable injury has been sustained, and this rule is true only if the employee is aware that the disability is due to [h]is employment. 7 Larson & Larson, *supra*, § 126.05[6]. Larson goes on to state that "[t]he claimant need not necessarily have positive medical information linking his or her condition to the employment if there is sufficient information from any source to put him or her on notice." *Id.* Larson adds that "[a] medical diagnosis may be held to start the statute running even if it is not as precise or accurate as it should be, provided the diagnosis shows the condition to be work-related." *Id.*

In the case before us, I am concerned that both the compensation judge and the majority essentially dismiss the reasoning and principles behind the giving of timely notice when they reach the conclusion that Anderson knew or should have known that his injury was caused by work in early July 2007. In reaching this conclusion, both appear to have placed significant weight on Anderson's answers to a series of questions. More particularly, they rely upon the following series of questions and answers.

Q. You knew that the work activities were causing your—were a cause of your low back problems or aggravating your low back problems, is that right?

A. Correct.

* * * *

Q. Although you don't recall Dr. Gallagher or Dr. Pinto telling you that your work was causing your problems, was causing your low back difficulties or aggravating your low back difficulties, you knew it?

A. I assumed it.

Q. All right. I'd like to refer you to—let's talk about—and you assumed that in your words, assumed that, in April of '07, correct?

A. Assumed what?

Q. Assumed that the work activities were causing or aggravating your low back, correct?

A. Correct.

* * * *

Q. On July—in July of '07 you assumed that the work activities—that the work activities were—were causing or aggravating your low back, didn't you?

A. It's correct that I was assuming that.

Q. All right. And your testimony remains that you realized it after you talked to Pinto?

A. Well, after I saw the first x-rays and the MRI's and the results and how much damage was done to my back, and they explained that everytime [sic] I bent over that there was two and a half centimeters of travel in my spinal cord, I mean in my back, and that it was pinching my spinal cord, that's when I realized from all the stooping and bending that I'd been doing all these years that my discs were wore out and they had to be replaced.

Q. And you knew that in May of '07?

A. That's when I—that's my own conclusion.

I do not view Anderson's answers to the foregoing questions to be as dispositive as do the compensation judge and the majority. Anderson freely admits that he knew for a long time that work aggravated his back problem, but he also testified that he knew that "[j]ust about everything I did made my back worse." Moreover, in all but one of the foregoing exchanges, the questions posed to Anderson were phrased by Anderson's employer using a disjunctive clause. More specifically, the questioner repeatedly used the disjunctive word "or" to separate the word "cause" from the word "aggravate." Anderson freely admitted that everything aggravated his back pain. He answered that question consistently; but, the fact that he acknowledged that work may have aggravated his back pain does not mean that he also acknowledged that work caused his back injury. To reach such a conclusion requires a rhetorical leap that I cannot take. Frontier chose the form and context of its questions and must be prepared to live with the answers given to its questions.

The majority responds to the dissent's concerns about its rhetorical leap to a conclusion based on Anderson's answers by first stating that the dissent "dismisses Anderson's testimony" and then asserts that the court must deny relief because Anderson's injuries were compensable "whether caused in the first instance by his work or whether his work merely aggravated a preexisting condition." Both responses by the majority are sufficiently wide of their mark that I believe they do little damage to the dissent's legal conclusion. First, the dissent does not dismiss Anderson's testimony, rather, it embraces his testimony by taking it at face value and

refusing to construe it either more broadly or more narrowly than an empirical analysis can justify. Second, the dissent does not contend that Anderson cannot legally recover workers' compensation benefits if "his work merely aggravated a preexisting condition." The majority's statement of the law will elicit no rebuttal.

Here, the dissent's response is to reiterate that even though aggravation of an existing injury can create a claim and Anderson knew that his work at Frontier bothered his low back, he concluded that all activity bothered his back and believed his back pain was due to a degenerative process. It was Anderson's self-analysis that led him to conclude that he did not have a compensable injury that must be reported to Frontier in July 2007. While we all can argue that maybe Anderson should have been able to figure out this legal conclusion for himself in 2007, I, unlike the majority, cannot conclude that under the circumstances here, Anderson was an unreasonable person because he did not figure it out and did not notify Frontier of his injury before May 2009. In essence, I conclude that the WCCA got it right when it said:

[E]ven though Mr. Anderson knew that work bothered his low back, he also knew that all activity bothered his low back; his doctors had identified his low back symptoms as being due to a degenerative process, he had symptoms in his hand and his arm which his doctors also attributed to degenerative changes; and at no time did any of his doctors ever discuss with him the possibility that his problem was work-related.... We believe that Mr. Anderson should not have been required to give notice to his employer that his problems were the result of his work history when there was no medical evidence making that connection and where the existing medical evidence

provided a different reason for his problems. Considering the evidence as a whole, we conclude that substantial evidence does not support a conclusion that a "reasonable" person would have known he had a compensable injury which needed to be reported to his employer until Dr. Gallagher and Dr. Pinto provided reports establishing a work relationship to Mr. Anderson's attorney. The letter sent by Mr. Anderson's attorney at that time constituted timely notice under the statute and case law.

*Anderson v. Frontier Commc'ns,* 2011 WL 1739771, at *5 (Minn.WCCA Apr 11, 2011).

The legal theory behind Minnesota's workers' compensation laws and the statutory scheme enacted by our Legislature to implement this theory support my conclusion. We have stated that Minnesota's workers' compensation system is one of mutual, reciprocal concessions by employers and employees. *See Lambertson v. Cincinnati Corp.,* 312 Minn. 114, 120–21, 257 N.W.2d 679, 684 (1977). For an injured worker, the system is designed to provide 'guaranteed compensation' from his or her employer for work-related injuries, 'in exchange for forfeiting the right to sue the employer in tort.' *Kline v. Berg Drywall, Inc.,* 685 N.W.2d 12, 17 (Minn. 2004) (quoting *Minn. Brewing Co. v. Egan & Sons Co.,* 574 N.W.2d 54, 58 (Minn. 1998)); *see also Matheson v. Minneapolis St. Ry. Co.,* 126 Minn. 286, 294, 148 N.W. 71, 74–75 (1914) (holding that the Workers' Compensation Act does not violate either the United States or Minnesota Constitution despite employees' waiver of the right to a jury trial and providing employers with exemption from common-law liabilities). In the past we have said that broad remedial remedies are an important part of the statutory scheme the Legislature has enacted to replace an employee's common-law remedies. More particularly, we have "indicated on many occasions that the purpose of workers' compensation is broadly remedial and that workers' compensation laws are to be construed to favor employee recovery of benefits." *Lambertson,* 312 Minn. at 121, 257 N.W.2d at 684.

The law has changed since we decided *Lambertson* in 1977. Minnesota Statutes section 176.001, as enacted in 1981 and amended in 1983, specifically says that:

It is the intent of the legislature that chapter 176 be interpreted so as to assure the quick and efficient delivery of indemnity and medical benefits to injured workers at a reasonable cost to the employers who are subject to the provisions of this chapter. *It is the specific intent of the legislature that workers' compensation cases shall be decided on their merits and that the common law rule of "liberal construction" based on the supposed "remedial" basis of workers' compensation legislation shall not apply in such cases. . . .* the legislature hereby declares that the workers' compensation laws are not remedial in any sense and are not to be given a broad liberal construction in favor of the claimant or employee on the one hand, nor are the rights and interests of the employer to be favored over those of the employee on the other hand.

Minn.Stat. § 176.001 (2010) (emphasis added).

But, the fact that the "common law rule of 'liberal construction' based on the supposed 'remedial' basis of workers' compensation legislation shall not apply in [workers' compensation] cases" does not mean that we are to apply the workers' compensation statute narrowly when deciding whether a worker is entitled to benefits. Far from it. We have said that we will apply the law in an "even-handed" fashion so that application of the law will "yield reasonable results consistent with prior

decisions of this court" and that the workers' compensation law "shall be construed in a nondiscriminatory fashion." *O'Malley v. Ulland Bros.*, 549 N.W.2d 889, 894 (Minn.1996). More particularly, we said in *O'Malley:*

> In two of our cases decided after the 1983 amendments to the Act, we have discussed the construction of the Act. We said, "Statutes are to be construed so as to yield reasonable results, consistent with the admonition contained in Minn.Stat. § 176.001 (1984) that the Act is to be construed in a nondiscriminatory manner." *Hagen v. Venem*, 366 N.W.2d 280, 284 (Minn.1985); *see also Foley v. Honeywell*, 488 N.W.2d 268, 271–72 n. 2 (Minn.1992). We hold that the even-handed standard is the correct standard to apply in determining questions of law under the Act. The even-handed standard permits the Act to be construed to yield reasonable results consistent with prior decisions of this court and with the legislative intent of section 176.001— that is to say, that the Act shall be construed in a nondiscriminatory fashion.

*Id.* Here, I conclude that both the compensation judge and the majority have failed to keep this standard in proper focus. Given the context of our prior case law they have failed to reach a nondiscriminatory decision that yields an even-handed result.

Before ending my dissent, I believe a few additional observations and comments are appropriate. The record provides substantial evidence that at all times while employed by Frontier, Anderson was a hardworking and conscientious employee. The record shows that Anderson adopted a stoic, even a long-suffering attitude toward his low-back pain. The record also indicates that he was not well informed with respect to workers' compensation law, the medical evidence related to his injury, or the relevance of this medical evidence to his right to seek compensation.

Our society tends to affirm, even applaud, those who work hard despite the presence of certain ailments and pain. We often praise those who refuse to blame others for their health problems. In fact, our country's history of high worker productivity depends in part on this type of selfless attitude. In this case, Anderson displayed a stoic attitude with respect to work and his back injury. That he demonstrated this attitude should not be surprising given our state's history.

Reading Sinclair Lewis, a recipient of both the Pulitzer (which he refused) and Nobel Prize for Literature,[4] listening to Garrison Keillor's radio show, "A Prairie Home Companion," or reading Keillor's numerous books on Lake Wobegon informs us that many Minnesotans, especially rural Minnesotans, have adopted a stoic attitude toward life's travail.[5] My background as a Minnesota farm boy has pro-

4. Early in Sinclair Lewis's acclaimed novel *Main Street*, protagonist Carol meets her then-future husband, Dr. Will Kennicott, and learns that he is a doctor in a small Minnesota farm town. Carol proclaims that being a doctor must provide Kennicott with "such an opportunity for sympathy." Kennicott replies, "Oh, these Dutch farmers don't want sympathy. All they need is a bath and a good dose of salts." Sinclair Lewis, *Main Street* 14 (1920).

5. If reading Sinclair Lewis or listening to Garrison Keillor is not sufficient to make my point, then a reference to the writings of Minnesota authors such as Howard Mohr, the late Bill Holm, or Joe Paddock's commentaries and poems should finish the job. Sometimes an author's depiction of a stoic attitude and the cumulated effects of a lifetime of travail are recounted in a somewhat humorous vein. (*See, e.g.,* Joe Paddock, *Old Martin, in* Earth Tongues 29 (1985)).

vided me with several opportunities to witness firsthand examples of this stoic and long-suffering attitude toward work and work-related injuries. While it may be legitimate to question the soundness of Anderson's attitude and his judgment with respect to work and his low-back injury, I do not believe that it is reasonable under our workers' compensation statutory scheme for us to deny him the right to seek compensation for his work-related injury. We should not deny him the opportunity to recover just because his outlook on life led to his unwillingness or inability to attribute his low-back injury to his work at Frontier. The combination of this perspective with the fact that none of his treating physicians advised him about the possible connection between work and his injury should not be fatal to his claim.

I conclude that Anderson should not have been required to give notice to Frontier within 180 days of the date of his back surgery in July 2007, that his problems were the result of his work history with Frontier. At that time there was no medical evidence available to Anderson connecting his injury to his work. Instead, the existing medical evidence provided different reasons for his back problems, reasons that Anderson, given his attitude toward work and pain, apparently accepted without question. Considering the evidence as a whole, I conclude that substantial evidence does not support a conclusion that Anderson did know or should have known he had a compensable injury which needed to be reported to Frontier until Drs. Gallagher and Pinto provided reports to Anderson's attorney in April or May 2009. It was these reports that first established a relationship between Anderson's injury and his work for Frontier. Therefore, I would hold that the letter sent by Anderson's attorney on May 13, 2009, constituted timely notice to Frontier under the statute and our case law.

MEYER, Justice (dissenting).

I respectfully dissent. An employee is required to give notice of his or her work injury to an employer. Minn.Stat. § 176.141 (2010). In the case of a *Gillette* injury, the notice period begins to run "from the time it becomes reasonably apparent to the employee that the injury has resulted in, or is likely to cause, a compensable disability." *Issacson v. Minnetonka, Inc.*, 411 N.W.2d 865, 867 (Minn.1987).

I would conclude that the testimony established that Anderson did not have sufficient knowledge in April or July of 2007 to know he had a compensable work-related injury. He did not know about the concept of a *Gillette* injury and his testimony was that even though he knew that work bothered his low back, he also knew that all activity caused back pain. I would hold, as did the WCCA, that substantial evidence did not support the compensation judge's conclusion that a "'reasonable' person would have known [Anderson] had a compensable injury which needed to be reported to his employer until Dr. Gallagher and Dr. Pinto provided reports establishing a work relationship." *Anderson v. Frontier Commc'ns*, 2011 WL 1739771, at *5 (Minn. WCCA Apr. 11, 2011). I would therefore affirm the WCCA in this case.

PAGE, Justice (dissenting).

I join in the dissent of Justice Meyer.

ANDERSON, PAUL H., Justice (dissenting).

I join in the dissent of Justice Meyer.